[Cite as *Hackathorne v. Hackathorne*, 2018-Ohio-2622.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

DEANNE L. HACKATHORNE,

    PLAINTIFF-APPELLANT,          CASE NO.  14-17-13

    v.

DANIEL J. HACKATHORNE,          O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court
Domestic Relations Division
Trial Court No. 16DR0179

Judgment Affirmed

Date of Decision:   July 2, 2018

APPEARANCES:

    *Alison Boggs* for Appellant

    *Oliver Herthneck* for Appellee

Case No. 14-17-13

**SHAW, J.**

{¶1} Plaintiff-appellant, Deanne L. Hackathorne ("Deanne"), brings this appeal from the November 8, 2017, judgment of the Union County Common Pleas Court entering its final decree of divorce and shared parenting plan ("SPP"). On appeal, Deanne argues, *inter alia*, that the trial court erred by electing to employ the SPP custody schedule suggested by defendant-appellee, Daniel Hackathorne ("Daniel")—with some modifications—and that the trial court erred in ordering the marital residence sold after the parties' child finished high school.

*Relevant Facts and Procedural History*

{¶2} Deanne and Daniel were married in 1990 and had one child together, C.H., born in January of 2001. In 2002, Deanne had a serious fall that left her with ongoing problems, leading to her being classified as disabled, and unable to perform essential duties of gainful employment. As a result, she received social security disability benefits.[1]

{¶3} From several months after her injury until 2013, when she received new treatment and medication, Deanne was afflicted with various issues that left her incapacitated as often as 3-4 days per week. Since the change in her treatment in 2013, she is still classified as disabled but the number of days she is incapacitated has been drastically reduced.

---

[1] Deanne certified to the Social Security Administration in the Fall of 2016 that she still could not perform the essential duties of gainful employment.

-2-

{¶4} Prior to Deanne's injuries, the parties shared in the household duties. After her injury, until 2013, Daniel took over the bulk of household duties, including raising C.H. Since Deanne's relative recovery, she has resumed the ability to be actively involved in C.H.'s life and in taking care of the residence.

{¶5} While the divorce was pending, the parties engaged in a "nesting" arrangement, wherein the parents rotated living in the marital residence with C.H. every other week. The parties had the marital residence built together, designing it specifically with high countertops to accommodate their height. The high countertops also assisted with Deanne's issues, preventing her from having to look down, which aggravated some of her health problems.

{¶6} In addition to the marital residence, the parties owned an adjacent lot that Daniel and C.H. used to play paintball and ride dirt bikes. The parties had a number of other assets, including vehicles, retirement accounts, and various items of personal property. However, the parties represented that they had reached an agreement through mediation on all issues other than the parenting time arrangement for C.H. and who should be awarded the marital residence.

{¶7} The parties agreed and stipulated that a SPP should be instituted, they just did not agree as to when parenting time should take place between the parties. The final hearing proceeded on those defined issues of who would be awarded the marital residence and the SPP schedule.

{¶8} At the final hearing, the GAL who had been appointed for C.H. provided testimony that he felt a 50-50 split in parenting time was in C.H.'s best interest. The GAL indicated that he spoke with C.H., the parties, and a number of people related to the parties, and the GAL felt that both Daniel and Deanne were good parents. The GAL indicated that C.H. would benefit by continuing equal relationships with both parents, and that C.H. did not want to have to choose between his parents. The GAL also indicated that C.H. wanted to stay in the marital residence until graduation. At the time of the final hearing C.H. was a junior in high school.

{¶9} Each of the parties then provided testimony at the hearing. Deanne testified regarding the health issues she had since her fall in 2002 and how she had improved since 2013. She testified as to the things she was able to do around the house now and she testified that she wanted the marital residence.

{¶10} Deanne testified that Daniel traveled a lot for work, and that she had concerns regarding Daniel's drinking habits—concerns that the GAL did not share after looking into the matter. Deanne requested a parenting schedule wherein every other week Daniel would have C.H. from Thursday through Sunday, giving her the majority of time with C.H.

{¶11} Daniel provided testimony at the final hearing that he had a significant role in building the marital residence because the builder went bankrupt before the

home was completed and Daniel had to finish a lot of the work himself. Daniel testified that he performed regular maintenance on the home and the adjacent lot, and that the adjacent lot was used for camping, fishing, and for dirt bikes. He felt that he was the party who could maximize the value of the home for a future sale given that he had no physical limitations. He also got more use out of the adjacent lot. He desired to be awarded the marital residence.

{¶12} As to custody, Daniel indicated he wanted a 50-50 split in time. He acknowledged that he had traveled for work significantly in the past as a software developer but he indicated that he could travel on his own schedule and that as he moved up in seniority he was traveling less.

{¶13} At the conclusion of the hearing the magistrate had the parties reiterate the stipulations that they had reached with regard to various property, including 401k plans, vehicles, and some personal property. Among other things, the parties stipulated that Daniel would pay Deanne $4,500 per month in spousal support, that Daniel would pay all school related extracurricular activities, and that child support would be deviated to $0. The magistrate allowed the parties to file written closing arguments on the disputed issues, which they did, then the matter was submitted to the magistrate for decision.

{¶14} On September 19, 2017, the magistrate filed its decision. As relevant to this appeal, Deanne was given exclusive possession of the residence from the date

of the order until July 31, 2018. On August 1, 2018, Daniel would have exclusive possession of the marital residence until May 31, 2019, or until the property was sold, whichever event occurred *last*. On or before June 1, 2019, the marital residence would be put up for sale, coinciding with C.H.'s graduation from high school. Proceeds from the sale—or losses—were to be split between the parties.

{¶15} Shared parenting was also ordered pursuant to Daniel's plan, with some modifications made by the magistrate. The provisions of the SPP included that Daniel would have custody of C.H. weekly Thursday at 5 p.m. until Monday at 8 a.m., and Deanne would have physical custody of C.H. from Monday at 8 a.m. until Thursday at 5 p.m. This schedule would continue until August 1, 2018, at which time the schedule flipped, with Daniel having C.H. from Monday at 8 am to Thursday at 5 p.m., and Deanne having C.H. weekly from Thursday at 5 p.m., to Monday at 8 a.m.

{¶16} Deanne filed objections to the magistrate's decision. She argued that the magistrate failed to appropriately consider the factors of R.C. 3109.04(F)(1) and erred in recommending a SPP that did not provide her with weekend parenting time before August 1, 2018. She also argued that the magistrate erred in failing to recommend that both parties refrain from consuming alcohol while exercising their parenting time, that the magistrate erred in failing to retain jurisdiction over the sale of the marital residence, that the magistrate erred in recommending that the marital

residence be sold, and that the magistrate failed to recommend an allocation as to two life insurance policies.

{¶17} Daniel filed a response to the objections, arguing that they should all be overruled.

{¶18} On November 7, 2017, the trial court filed an entry addressing Deanne's objections to the magistrate's decision. The trial court conducted an independent review of the record and individually analyzed each of the objections, finding them to be without merit.

{¶19} On November 8, 2017, the trial court filed its Decree of Divorce and SPP. The trial court's entry largely reiterated the magistrate's decision as its final judgment.

{¶20} It is from this judgment that Deanne appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The magistrate erred when he disregarded the parenting schedule recommended by the Guardian Ad Litem and approved by appellee at the final hearing, and substituted his own judgment in creating a parenting schedule that precludes both parents from having weekend parenting time with the minor child while each is living in the marital residence. The schedule created by the magistrate and adopted by the judge is not in the best interest of the minor child.**

**Assignment of Error No. 2**
**The magistrate erred when he tied the sale of the marital residence to the shared parenting plan. Further, the magistrate**

and judge erred when the court did not expressly retain jurisdiction over the sale of the house.

**Assignment of Error No. 3**
**The magistrate erred when he ordered the marital residence be sold after the minor child emancipated instead of allocating the marital residence to appellant as part of the property division.**

**Assignment of Error No. 4**
**The magistrate erred when he failed to order both parents to refrain from drinking when the minor child is in their respective custody, when concerns regarding drinking were raised at the final hearing and it was a term of the temporary orders.**

**Assignment of Error No. 5**
**The magistrate erred when he failed to award appellant one half of the values of the prudential life insurance policy and the guardian whole life policy as part of the property division.**

{¶21} We elect to address some of the assignments of error together.

*First Assignment of Error*

{¶22} In Deanne's first assignment of error, she argues that the parenting schedule entered by the trial court "defeated every objective of the parents." She argues that the trial court should have employed either the SPP schedule she proposed, or the "plan" proposed by the GAL, which was to continue week-on/week-off parenting.

Standard of Review

{¶23} " 'Decisions concerning child custody matters rest within the sound discretion of the trial court.' " *Krill v. Krill*, 3d Dist. Defiance No. 4-13-15, 2014-Ohio-2577, ¶ 26, quoting *Walker v. Walker,* 3d Dist. Marion No. 9–12–15, 2013–

Ohio–1496, ¶ 46, citing *Wallace v. Willoughby,* 3d Dist. Shelby No. 17–10–15, 2011–Ohio–3008, ¶ 22 and *Miller v. Miller,* 37 Ohio St.3d 71, 74 (1988). "Accordingly, an abuse of discretion must be found in order to reverse the trial court's award of child custody." *Walker*, citing *Barto v. Barto*, 3d Dist. Hancock No. 5-08-14, 2008-Ohio-5538, ¶ 25 and *Masters v. Masters,* 69 Ohio St.3d 83, 85 (1994). An abuse of discretion suggests the trial court's decision is unreasonable or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## Analysis

{¶24} In this case, the parties stipulated that they agreed "to shared parenting with the parent having physical possession of the home being deemed residential parent for school placement purposes." Although the parties agreed that they wanted shared parenting, they did not agree on a schedule.

{¶25} When the final hearing first convened, Daniel thought the parties had agreed on a schedule wherein they would split custody of C.H. each week; however, Deanne's understanding was that Daniel would only get custody of C.H. every *other* week from Thursday night to Sunday, rather than every week as Daniel thought. The parties thus could not come to an agreement, and left the matter up to the court for determination.

{¶26} The court heard testimony on the issue, including from the GAL, who recommended a 50-50 split in custody. In his report, the GAL suggested a week-

on/week-off schedule, similar to what the parties had been doing during the temporary orders.

{¶27} Deanne filed a proposed SPP requesting physical custody of C.H. from Monday through the following Thursday, thus giving Daniel parenting time every other weekend, slightly extended. Daniel filed a plan indicating that the person who was awarded the marital residence would have custody of C.H. Monday to Thursday at 5 p.m., then the other parent would have custody from Thursday at 5 p.m. to Monday morning.

{¶28} The magistrate found that after reviewing the SPP proposals, Deanne's was not in the best interest of C.H. as it did not give each parent equal time. Similarly, the magistrate did not agree entirely with Daniel's plan, and thus made some modifications, but ultimately elected to adopt an amended version of Daniel's plan after analyzing all of the appropriate statutory factors.

{¶29} Deanne objected to the magistrate's decision, and the trial court overruled the objection. The trial court found that the magistrate's decision "adroitly honors" the child's best interests "while simultaneously considering the statutory standards." (Doc. No. 83).

{¶30} Deanne now argues that the trial court erred and should have adopted either her plan, or the GAL's proposed week-on/week-off schedule. Notably, the GAL just repeatedly stated at the final hearing that he felt that a 50-50 split in

parenting time was best as both parents got along well with C.H. and both were good parents. Daniel's plan, as modified by the magistrate and adopted by the trial court, gave essentially a 50-50 split in parenting time. So while Deanne argues that the trial court did not accept the GAL's "plan," the trial court actually did accept the GAL's "recommendation" of a 50-50 split. It was just employed differently.

{¶31} We see nothing in the record arbitrary or capricious about the trial court's decision as the trial court attempted to provide equal time to each parent and ensure that each parent was spending adequate time with C.H. on a weekly basis. Under these circumstances, we cannot find that the trial court abused its discretion. Therefore, Deanne's first assignment of error is overruled.

*Second and Third Assignments of Error*

{¶32} Deanne's second and third assignments of error dispute the trial court's determination that the marital residence should be sold rather than awarding it to her, and she argues that the trial court erred in setting up the process for the residence to be sold. Specifically, Deanne contends that the order related to the sale of the property was not specific enough and that Deanne should have been awarded the marital residence, allowing her to buy Daniel out of his equity with an offset from her share of Daniel's 401(k).

## Standard of Review

**{¶33}** Trial courts in domestic relations cases have broad discretion when determining the equitable settlement of property following a divorce. *Warnecke v. Warnecke*, 3d Dist. Putnam No. 12-01-05, 2002-Ohio-1420. Thus a trial court's determination will not be reversed absent an abuse of that discretion.

## Analysis

**{¶34}** In this case, both parties desired to be awarded the marital residence and essentially desired the other party not to have the marital residence. The parties were made aware of the fact that if they did not come to an agreement, the residence could be ordered to be sold. *See* R.C. 3105.171(J)(2).

**{¶35}** Given that C.H. was nearing the age of majority and close to finishing high school (May of 2019), the trial court did not order the residence sold until after C.H. graduated. Before that time, Deanne was permitted to remain in the residence until July 31, 2018. On August 1, 2018 until May 31, 2019, Daniel would have exclusive possession of the residence, or until the property sold, whichever event occurred last.

**{¶36}** The trial court specified that on or before June 1, 2019, the real estate would be listed for sale. The trial court specified a realtor to be used if the parties could not agree on one on their own, and a price to be listed at coinciding with an appraisal. Upon sale of the property, the parties would equally divide the net

proceeds after payment of all encumbrances, or share equally in any losses. As it relates to Deanne's second assignment of error, we fail to see how the trial court's ruling lacked specificity or failed to adequately address the matter. Therefore, Deanne's second assignment of error is overruled.

**{¶37}** Further, we cannot find an abuse of discretion in finding that the property should be sold rather than awarding it to Deanne. Both parties desired to own the residence and they could not come to an agreement on it. Both parties were given a period of time to live in the house alone prior to attempting to sell it. The trial court determined that Daniel would be in the best position to readily perform upkeep on the home and the adjacent property just prior to sale.

**{¶38}** While there was some indication that the high countertops assisted with Deanne's condition, there was also testimony that Daniel enjoyed the home and the adjacent lot, and that he attached some sentimental value to it for the work he put in. As the parties could not come to an agreement on the home, we cannot find that the trial court's determination that it be sold amounted to an abuse of discretion as it was well within the trial court's authority. Therefore, Deanne's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶39}** In Deanne's fourth assignment of error, she argues that the trial court erred by failing to order that both parents refrain from drinking when C.H. was in their custody after she raised concerns regarding Daniel's drinking habits.

**{¶40}** Deanne's argument in this assignment of error is based on her own testimony that she had observed Daniel's drinking habits increase prior to the separation. At the final hearing, she emphasized one incident in particular where she had a receipt showing that Daniel had purchased two 22 ounce beers while he was out to eat with coworkers following a business trip, though Daniel testified that he did not drink the second beer as he had to leave when he got a call from C.H. to pick him up and take him to a football game. Daniel testified that he had stopped drinking altogether when C.H. was in his care.

**{¶41}** The GAL investigated Daniel's drinking habits and found no indication that Daniel had a drinking problem. In fact, Deanne's own sister told the GAL that Daniel did not have a drinking problem. The magistrate found that there was no indication that Daniel had an issue with alcohol and the trial court overruled Deanne's related objection to the magistrate's decision.

**{¶42}** Given the evidence in the record, we cannot find that the trial court abused its discretion such that this issue needs to be reversed. Other than testimony indicating that Daniel would occasionally have a beer or drink with dinner after

Case No. 14-17-13

work, there is no testimony indicating he had any kind of problem that required restrictions. Therefore, Deanne's fourth assignment of error is overruled.

*Fifth Assignment of Error*

**{¶43}** In Deanne's fifth assignment of error she argues that the trial court erred by failing to award her one half of the value of a "Prudential" life insurance policy and one half of a "Guardian" whole life insurance policy as part of the property division. Specifically, she contends that the trial court failed to make any mention of the life insurance accounts and how they should be split, even after she objected to the magistrate's failure to distribute the policies.

**{¶44}** Notably, the parties represented to the magistrate at the final hearing that they had resolved *all* issues other than the parenting schedule and who should be awarded the marital residence. No testimony was given regarding any life insurance policies, who they were owned by, whether they were marital property or not, and what value they had, if any.

**{¶45}** The only time that the life insurance policies were brought up *at all* was when the magistrate noted *after* the final hearing that there were seemingly two life insurance policies and the magistrate inquired as to whether there was any cash value.

> **THE COURT:**[2] **\* \* \* There was no discussion with respect to life insurance. I noted in my review that there are two policies. Were**

[2] The court reporter refers to the magistrate as "the court" in the transcript of the proceedings. Although inaccurate, we have left the reporter's styling in its original form.

-15-

there any cash values associated with those policies? My notes show Guardian and Prudential.

[DANIEL'S ATTORNEY]: Your Honor, I understand there's two life insurance policies. One is a Fidelity and one is a Guardian. The Fidelity account was created by Dan's parents for Dan when Dan was 20 and in college. So, we would say that would be his separate property. The other one has some cash value, marital property, so we would pose that – um, sometimes these things have clauses to either take one or the other person's name off of the account. So, if that's possible, Dan would maintain the account, cash out the cash value, pay her half of it and maintain that account. And, if not, then close it and split whatever the cash value is.

THE COURT: Well, however – whatever you folks decide is fine with me. I just want to make sure it doesn't fall through the cracks.

[DEANNE'S ATTORNEY]: Right. Your Honor, actually, in ours, there were four. Three Guardian's and one Prudential. The two Guardians have no cash value. One of them is, apparently, for [C.H.].

[DANIEL'S ATTORNEY]: Yes.

[DEANNE'S ATTORNEY]: And then, um, there's one that does have some value and so we would split that.

[DANIEL'S ATTORNEY]: Is that the Guardian?

THE COURT: Well, as long as you address that in your stipulation. And then the personal injury settlement balance that's left is going to be considered separate property of [Deanne]. Is that the stipulation?

[DEANNE'S ATTORNEY]: Yes, Your Honor.

(Tr. at 162-164).

{¶46} Based on the dialogue at the final hearing, there did not seem to be any dispute as to what should occur with any existing life insurance policies that were marital. Deanne now argues that the magistrate erred by not acquiring exact amounts of the cash values of any accounts to be split to ensure that a division was equitable. However, the parties appeared to be in agreement to divide any cash value of *marital* life insurance policies 50-50, which would certainly be equitable.

{¶47} Deanne objected to the magistrate's purported failure to include anything in its decision regarding life insurance policies, stating that the policies should have been dealt with. The trial court overruled the objection, stating as follows.

> **The Court FINDS that the parties presented no evidence regarding either of these policies. Further, the parties represented to the Court that all matters save for allocation of the marital residence, related residential expenses and the Shared Parenting Plan were resolved by agreement. Absent evidence, the Court cannot enter findings. * * * [Deanne's] fifth objection is without merit.**

(Doc. No. 83).

{¶48} On appeal, Deanne now requests that we reverse the trial court's decision and remand this matter back to the trial court for an evidentiary hearing on the purported life insurance policies and the values of the policies.

{¶49} As the trial court noted, we have no actual *evidence* before us regarding any purported life insurance policies. We have only statements that there

may or may not have been one policy with some cash value that needed to be equally divided—and that is *if* it was not the same policy that was referenced as being C.H.'s.

{¶50} Deanne seems to assert that there are two policies that need to be divided, a Prudential policy and a Guardian Policy. There is no evidence to support that.[3]

{¶51} As to the listed Guardian policy, the parties seemed to be in agreement to divide it equally. The magistrate ordered the parties to address it in their stipulations if there was any value. We have no indication from actual *evidence* presented at the final hearing that there was something of value that was not addressed. For all of these reasons Deanne's argument is not well-taken, and her fifth assignment of error is overruled.

---

[3] In Deanne's deposition, she had an attached exhibit that listed four purported life insurance policies, three from Guardian and one from Prudential. Two of the Guardian policies were listed as "no cash value," one Guardian policy was listed as $2,491 cash value, and the one Prudential policy was listed as a cash value of $12,015. Beside the Prudential policy the name "Dan" was handwritten in, whereas the other policies all have "Both" handwritten in, as though the Prudential account was Daniel's separate property, similar to his attorney's statements at the final hearing. There simply does not appear to be any support for any failure to divide a Prudential policy. Regardless, none of this information was introduced at trial. Further, even the exhibit to Deanne's deposition was not testified to, thus we have no real context for what it says regarding the purported policies and we have no idea whether the figures were accurate.

-18-

*Conclusion*

{¶52} For the foregoing reasons Deanne's assignments of error are overruled and the judgment of the Union County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and PRESTON, J.J., concur.**

**/jlr**